DAVID RIDENOUR, ET AL., *vs.* THOMAS KELLER, SHERIFF OF WASHINGTON COUNTY.—*December* 1844.

A sheriff who has made a levy upon personal property, under a writ of *fieri facias*, in good faith apprehending danger of loss by reason of the conflicting claims made upon it, is entitled to have the title of the claimant settled in equity, and be protected in the mean while by injunction.

The accounts of an administratrix, making a distribution of her intestate's estate in money, no creditor nor fraud appearing, will not, after a lapse of sixteen years, be disturbed in equity, where she was guardian to her infant children, and paid them the interest on the sum distributed to them during her life, and her successor in the guardianship received the amount distributed, from her personal representative, though she had taken to her own account, certain portions of her intestate's estate at their appraised value, which portions remained in *esse* at the time of her death.

The court will presume that distribution of an intestate's estate, had, after a lapse of four years, been made, where creditors were not interested; no charge of fraud made; and it appearing that, all the distributees had received their proportions of the appraised value of the estate in money, and some of them had disposed of the same.

Ridenour. *et al.*, *vs.* Keller.—1844.

Where an administratrix took a portion of her intestate's estate, to her own account, at the appraisement, and paid the distributees their portions of the estate in money, which they kept for four years, and alleged no fraud; the distributees, seeking to set aside her settlements, must first do equity, and return what they have received, or offer so to do.

APPEAL from the Equity Side of *Washington* County Court.

The bill, in this cause, was filed on the 14th June 1842, by *Thomas Keller*, sheriff of *Washington* county, and alleged, that a judgment was rendered in *W.* county court, at March term 1839, against a certain *Abraham Barnes* and *Melchior B. Mason*, in favor of a certain *David Ridenour*, for, &c., which judgment, was afterwards entered to the use of *Lot Ensey* and *Christian D. Fahnestock*, late partners, trading under the name and firm of *Lot Ensey and Company*, who became, and are the equitable assignees of said judgment. That on the 25th day of February 1841, a *fi. fa.* was issued upon said judgment, directed to *John Carr*, *esq.*, then sheriff of said county, and the same day delivered to him; that afterwards, and before the return day of said execution, the said *John Carr* levied upon a large number of negroes, and other personal property, which was shown to him by the plaintiff, in said execution, and alleged to be the property of the said *Abraham Barnes*, and *Melchior B. Mason*, or one of them; that a part of the personal property mentioned in said levy list, was admitted to be the property of said *Barnes* and *Mason*, or one of them, which part was afterwards sold by the said *Carr*, as sheriff, by virtue of said *fi. fa.*, a true list of said articles, so admitted and sold, is herewith exhibited; that afterwards, on the 4th February 1842, the said *John Carr* departed this life, before the term for which he had been elected and commissioned as sheriff, had expired; that a few days thereafter, your orator was duly commissioned as sheriff of said county, gave bond, accepted the office, and was, in all respects, qualified according to law. That letters testamentary on the personal estate of said *Carr*, were, afterwards, granted to *James Dixon Roman*, who accepted the trust, and within twenty days thereafter, delivered over to your orator the said writ of *fieri facias*,

together with the said levy list, and the list of appraisement, and all other papers connected with, or relating to said writ; which your orator duly accepted.    Whereupon, it became the duty of your orator, to proceed as the said *Carr* should have done; that the return day of said writ has been extended from time to time, at which it was originally returnable, until now, when it stands extended until the first day of *August* next; that the said property, mentioned in the said levy list, except the part so sold as aforesaid, has been, and is claimed by several other persons, and denied to be the property of said *Barnes* and *Mason*, or either of them: some of said claimants claiming separate and distinct articles, and some of them claiming in opposition to each other.    And your orator begs leave to state briefly, the nature of the several claims, so that your honors may see the great difficulty in which your orator is placed, and the utter impossibility of deciding to whom the property belongs, and thus avoid danger and loss to himself, without the aid of this honorable court.    Your orator is informed, and believes, that most of the articles mentioned in said levy list, except those sold as aforesaid, were formerly the property of *John Thomson Mason*, of said county, who departed this life intestate, on or about the month of December 1824; that letters of administration on his personal estate were granted to his widow, *Elizabeth Mason;* that she, as administratrix, took possession of the personal estate of said deceased, consisting of most of the articles now disputed in said levy list, together with a large amount of other property of great value; that she, the said *Elizabeth Mason*, made no distribution of the said personal estate, at least, of that portion contained in said levy list, nor did she make sale thereof, but charged herself with the whole amount at the appraised value thereof, and retained the same in possession until her death, which occurred in the month of May or June, 1836.    That soon after her death, the said *Abraham Barnes* and *Melchior B. Mason*, obtained letters of administration on her personal estate, and proceeded to make settlement thereof; that they distributed a part of said negroes amongst the heirs of the said *Elizabeth*, and retained

the balance of said personal estate, charging themselves therewith, in their settlements with the Orphans' court, at the appraised value thereof, and retained possession of the said property, with which they had so charged themselves. And your orator further states, that afterwards, on the 9th January 1839, the said *Abraham Barnes, Melchior B. Mason,* and a certain *John Thomson Mason,* their brother, executed a certain deed of trust to *John M. Gordon* and *William Schley, esqrs.,* for certain purposes therein mentioned, and conveyed to them a large number of negroes belonging to said parties grantors respectively, and which deed also conveyed the negroes mentioned in said levy list; that afterwards, on the 15th May 1839, the said *A. B., M. B. M.,* and *J. T. M.,* executed another deed of trust, for other purposes therein particularly mentioned, conveying the same negroes, by name, to the said *J. M. G.* and *W. S.,* trustees, including the said negroes on said levy list; that the said *J. M. G.* and *W. S.,* now claim title to the said negroes mentioned in said levy list, by virtue of one or both the said deeds of trust, aforesaid, alleging, that the said negroes were the property of said *Barnes* and *M. B. Mason,* or one of them; and the title thereto was by said deeds of trust vested in them, the said trustees, for a purpose therein specified, which, has not yet been accomplished or fulfilled; and the said *J. M. G.* and *W. S.,* have forbidden your orator, at his peril, to sell any one of said negroes; and your orator further states, that afterwards, on the 11th October 1839, aforesaid, the said *A. B.,* and *M. B.,* his wife, *M. B. M.,* and *J. T. M.,* executed a certain other deed of trust to *William Price, esq.,* and *David G. Yost,* as trustees, conveying a large amount of property, real, personal, and mixed, including all the other negroes mentioned in said levy list, and also many other articles therein, in said list enumerated, to the said *Price* and *Yost,* as trustees, for certain purposes therein mentioned. And your orator states, that the said *W. P.* and *D. G. Y.,* as trustees, claim a large portion of the property mentioned in said levy list, under and by virtue of the said deed of trust, insisting, that they have the legal title to the same, and have for-

bidden your orator to sell any part of said property which is contained in said deed of trust; that afterwards, on the 12th November 1841, letters of administration, *de bonis non*, on the personal estate of the said *J. T. M.*, deceased, were granted to one *John Winter*, who accepted the trust; and now, he, the said *John Winter*, as administrator *de bonis non*, claims all the property, or nearly all, mentioned in said levy list, except the part sold as aforesaid, as the property of the said *J. T. M.*, which was not administered by the former administrator, *Elizabeth Mason*, in her life time, and insists, that the said *Elizabeth*, by charging herself with the, said property, and having made no sale or distribution, did not vest the title to said property in herself, but that it remained in her hands, as administratrix, until the time of her death; and therefore, the said *A. B.* and *M. B. M.*, as her administrators, had no right to, or control over, the said property; and, that the said *John Winter*, as administrator *de bonis non*, is solely entitled to the same, for the purpose of sale or distribution, according to law; and he claims the same in opposition to all others, and has forbidden your orator, at his peril, to remove or sell any part of that, which originally belonged to his said estate.   And your orator further states, that some time in the month of *November* 1841, the letters of said *Barnes* and *Mason*, as administrators of the said *Elizabeth Mason*, were duly revoked, and that on the 30th day of the same month, letters of administration, *de bonis non*, upon said estate, were granted to the said *John Winter;* that a part, or few of said articles mentioned in said levy list, are represented as having belonged to the said *Elizabeth*, in her own right, and that the mode of settlement adopted by her said administrators was illegal and void, and did not vest the title to such property in them; and insists, that he, as administrator *de bonis non*, is entitled to the same, as the unadminstered estate of the said *Elizabeth Mason*, deceased; and now claims the same, and has forbidden your orator to sell the articles thus claimed, which your orator cannot precisely enumerate. And your orator further states, that the said *David Ridenour*, the legal plaintiff, and *Lot Ensey*, the surviving partner of the

said *L. E.* and *Co.*, insist, that the said property is the property of the said *Barnes* and *Mason*, or one of them, and require your orator to sell it as such, and by virtue of the said writ of *fi. fa.*, and threaten your orator with a suit for damages, if he returns said writ, *nulla bona*. And your orator further states, that the former sheriff, the said *John Carr*, in his life time, summoned a jury of inquest, who were duly empannelled and sworn, to try and determine the title to said property; that a trial was had, wherein each of the said several claimants were represented by counsel, except the said *Gordon* and *Schley*, trustees as aforesaid, and the said jury rendered a verdict, which is herewith exhibited; but your orator is advised, that such verdict is, in law, no protection to him against the said several suits threatened, and which may be brought by the said parties. And your orator is advised and believes, that he cannot, safely to himself, either sell the said property, or return the said writ, *nulla bona*, but that the said several claimants ought to interplead together, touching their right to said property, in order that your orator may know to whom the property belongs, and whether the said *A. B.*, and *M. B. M.*, or either of them, have any, and what interest therein, which your orator can sell by virtue of said execution; and that the said several claimants ought, in the meantime, to be restrained by the order or injunction of this honorable court, from commencing or prosecuting any action at law against your orator, touching the premises; and especially, that the said plaintiff, in the said writ of *fieri facias*, to wit, the said *D. R.*, and the said *L. E.* and *Co.*, should be restrained from any proceedings to compel your orator to return said writ of *fi. fa.*. In tender consideration whereof, &c. Prayer in conformity to the bill.

The defendants answered this bill. A variety of accounts, and the deeds of trust, &c., were filed as proof, but the nature of the defence made, and the facts established, sufficiently appear in the opinions of *Washington* county court and of this court.

At March term, 1843, *Washington* county court, (T. BUCHANAN, A. J.,) delivered the following opinion:

The facts, as they appear from the admissions in the answers, or from the exhibits filed therewith, appear to be these.

*John Thomson Mason* died in 1824, leaving a large personal estate; his widow, *Elizabeth Mason*, administered on his estate, and returned an inventory and appraisement; she afterwards settled an account, charging herself with all the property contained in the inventory at its appraised value, and of debts; and distributed the cash balance amongst the heirs. There was no sale or distribution of the property, but the widow retained the possession of it until her death, in July 1836.

After her death, letters of administration, on her estate, were granted to *A. Barnes* and *M. B. Mason*, who, returned an inventory and appraisement of her estate, which consisted, almost, exclusively of the same property which she had charged herself with, as administrator of her husband. The said *Barnes* and *Mason*, made no sale or distribution of property, but charged themselves with the whole amount, at the appraised value, and after taking credit for the payment of debts, distributed the balance of value amongst the heirs; and afterwards, as a mode of paying said distributive shares, they distributed certain of the negroes to the several heirs, at a value fixed upon by appraisers, approved by the Orphans' court, for that purpose. The said *Barnes* and *Mason*, retaining all the other property, and a large number of the negroes; and after several deeds of trust, mortgaging the same for payment of certain debts.

The negroes, and other property have been levied upon by the sheriff as the property of said *Barnes* and *Mason*, under an execution against them, at the suit of *D. Ridenour*, use of *Lot Ensey* and *Company.*

It further appears, some of the heirs were minors, and the youngest did not attain the age of twenty-one years, until before the said levy was made; and, that soon afterwards, in November 1841, letters of administration, *d. b. n.*, on the estate of *John Thomson Mason*, were granted to *John Winter*, one of

the defendants, and that soon afterwards, letters of *ad. d. b. n.*, on the estate of *Elizabeth Mason*, were granted to the same person; and he claims the greater part of the property, as the unadministered property of *John T. Mason*, and a small part as the property of *Elizabeth Mason.*

The plaintiffs, in the execution, claim it as the property of *Barnes* and *Mason.*

*William Schley* and *John M. Gordon*, claim the negroes under the deeds of trust, exhibited.

And *Wm. Price* and *D. G. Yost*, claim many of the negroes under the deed of trust to them.

The question is, to whom does the property belong?

It is the opinion of the court, that *Mrs. Mason* had no right to charge herself with the personal estate of her husband, *Jno. Thomson Mason*, at the appraised value; and, that by so doing, she acquired no title to the property; but, she held the same as administratrix, and, at her death it remained as the unadministered estate of her husband, *John T. Mason;* and that *Barnes* and *Mason*, as her administrators, had no right to the same, and ought not to have included it in their inventory; after her death no legal title could be claimed, except by an administrator *de bonis non*, on his estate; and it follows, that all the distributions and settlements of the said property by her administrators were wholly void; and *John Winter*, as administrator, is now entitled to all the articles embraced in the levy which were the property of *Jno. Thomson Mason*, deceased. But *Elizabeth Mason*, appears to have been possessed of a small personal estate at the time of her death, which she had in her own right. But the administration, on her estate, seems to have been irregular and void in the same particular; they had no right to charge themselves with the appraised value of the property, and acquired no title thereby, and therefore, all those articles in the said levy, which belonged to her, are properly claimed by her administrator *de bonis non*. There is some difficulty about the negro man *John Robinson:* it is alleged, that he belonged to *Elizabeth Mason*, but was not returned in the inventory of her estate, through error or mis-

take, whilst the creditors allege, he belonged to *Barnes.* It is not necessary to decide this question, because he is included in the deeds of trust to *Gordon* and *Schley*, the purposes of which have not been accomplished; and, also, in the deed to *Price* and *Yost;* and, therefore, even if he was the property of *Barnes*, those grantees are now owners; and the sheriff had no right to levy upon him. There is, also, some difficulty about the silver plate, which *D. Ridenour* alleges to have been the property of *Richard Barnes*, and bequeathed to *Abraham Barnes* by his will, an extract of which is exhibited. *John Thomson Mason* was the executor of that will, and there is no evidence in the cause to show, that he ever assented to the bequest, nor that *Abraham Barnes* ever claimed it. The court is of opinion, that the only mode in which title to that plate can be acquired, is through an administrator *de bonis non*, with the will annexed, on the estate of *Richard Barnes.* If these principles be correct, and it is believed they are so, it follows, that *Abrabraham Barnes* and *Melchior B. Mason*, had no title to any of the articles now in dispute in this cause; and, that the sheriff had no right to take the same, under the execution against them.

It is thereupon, this 11th day of April 1843, by the court adjudged, ordered, and decreed, that *Thomas Keller*, release all the property mentioned in his bill of interpleader; and it is further adjudged, ordered, and decreed, that the defendants *David Ridenour* and *Lot Ensey*, and their agents and attorneys, be, and they are hereby perpetually enjoined, from instituting any proceeding against said sheriff, for releasing said property.

The defendants, *D. R., L. E., J. M. G., W. S., W. P., D. G. Y.,* and *J. W.,* appealed to this court.

The cause was argued before ARCHER, DORSEY, CHAMBERS, SPENCE, STONE and SEMMES, J.

By W. SCHLEY and WEISEL for the appellants, and
By ROMAN and McMAHON for the appellees.

SPENCE, J., delivered the opinion of this court.

All objections to this bill, by the agreement of the solicitors engaged in the argument, having been waived, we shall proceed to the consideration of the points submitted in the argument for the decision of this court.

The controling question in this case is presented by the *first* point, namely, the legality and effect of the course pursued by *Elizabeth Mason*, administratrix of *John T. Mason*, and that of *Abraham Barnes* and *Melchior B. Mason*, administrators of *Elizabeth Mason*, in the settlement of the estates of their respective intestates, before the Orphans court of *Washington* county.

On the part of the appellee, it is insisted, that the distributions made in the Orphans court in both of these estates, is legal and binding, so far as all the distributees are concerned; and on the other side, it is insisted by the appellants solicitors, that these distributions are illegal and void.

First, as to the administration and settlement of *John T. Mason's* estate, by his administratrix, *Elizabeth Mason*.

This estate appears to have been closed, final account passed, and distribution made in the Orphans court, on the 25th of August 1827, and each distributee's share thereof made out in dollars and cents.

The record discloses the fact, that *Elizabeth Mason*, the administratrix, was, by the orphans court, appointed guardian to the distributees, who were minors at the time. Her accounts passed by the orphans court, as guardian, show that she charged herself, as guardian, with the sum allotted in the distribution to each one of her wards, and annually thereafter, with the interest on the sum thus charged. It appears, also, from the record, that *John Dutton*, who, after the death of *Mrs. Mason*, was appointed guardian to such of the children and distributees of *John T. Mason*, as were then minors, adopted all her acts, and received from the estate of *Mrs. Mason*, the sum thus allowed them in the distribution. There is no fraud alleged in the settlement and distribution of the estate of *J. T. Mason*. There is no allegation of outstanding unpaid

debts against the administratrix, *qua* administratrix. Her final account was passed, and distribution made in the Orphans court on the 25th day of August 1825. Letters of administration *de bonis non* on the estate of *John T. Mason*, were granted to *John Winter*, on the 12th day of November 1841.

This statement of facts in the record shews conclusively, that, from the settlement of her administration account, and distribution of her intestate's estate in the Orphans court, more than sixteen years had elapsed, before letters of administration, *de bonis non*, on *John T. Mason's* estate, were granted to *John Winter;* and, after all the distributees who were of age, and those who were minors by their guardians, had received their distributive shares.

Letters of administration on the estate of *Mrs. Mason*, were granted by the Orphans Court of *Washington* county, to *Abraham Barnes* and *Melchior B. Mason*, shortly after her death, which occurred in July, 1836.

*Mrs. Mason's* administrators, returned an inventory of her personal estate, and included all the slaves involved in this controversy, except *John Robinson*, being the slaves which were returned by *Mrs. Mason*, as administratrix of *John T. Mason;* with the exception of those, born subsequently to the date of her inventory. The administrators on the estate of *Mrs. Mason* paid off her creditors, and passed a final account in the Orphans Court: that court made a distribution of the surplus of the estate, and appointed two persons to value and distribute the slaves among the legal representatives of *Elizabeth Mason*, deceased; who accordingly did make distribution; and returned a statement thereof to the Orphans Court. The record does not allege any demand of any outstanding, unpaid creditor, of either of the intestates, *John T. Mason*, or *Elizabeth Mason*, against their administrators *de bonis non*, *qua*, administrators. The record discloses the fact, that the distributees of *John T. Mason* and *Elizabeth Mason*, (excepting the widow of *J. T. Mason*,) are the same persons; that each of those distributees have received their portion, (those of full age themselves, the minors, by their guardians,) of their estate.

We are called upon, under this state of facts, to say, whether the court below decided correctly, that these distributions, thus made, under the sanction of the Orphans Court of *Washington* county, are null and void? We think not. It might readily be presumed, from the lapse of time, the receipt by all, and disposition of the estate by some, of the distributees; the acquiescence of the distributees, in the one case, of more than sixteen years, and in the other more than four years; no creditor of the intestates making demand of payment; and no charge of fraud; that distribution had been made, even if it did not appear from the record. Vide. *Allender, adm'r of Wyse vs. Riston*, 3 *Gill & John.* 86.

We are of the opinion, from all the facts which the record in this case reveals, that the distribution made in the Orphans Court of *John T. Mason's* estate, by his administrators, was so made with the knowledge, consent, and full approbation of all the parties, legally interested therein. The administratrix was the mother, the natural guardian, and guardian in fact, of all of the distributees After the death of *Mrs. Mason, Mr. Dutton*, who succeeded her in the guardianship of these, her wards, manifestly approved this distribution thus made, by adopting her acts as guardian; and receiving from her administrators the sums apportioned to each of her wards.

Our conclusion, drawn from these facts, is placed beyond a doubt by the lapse of time when this distribution was made, before any attempt is made to question its integrity. This transaction slept for more than sixteen years, in as profound silence as its author; and, when an effort is made, to drag it up from its long repose, it is not by any charge of deceit, or unfairness, or fraud, but that the letter of the law had not been fully observed, performed, and kept.

Again, this effort is not being now made by the demand of any unpaid, inexorable, creditor of *J. T. Mason*; we hear of no such demand. If, then, it be at the instance of the distributees, through the instrumentality of the administrator *de bonis non*, they come with ill grace, too late, and not in the proper form. If the guardian had acted unfaithfully, or un-

19     v.2

fairly, in the discharge of her trust, their redress was clear and ample at law, on her bond. It is too late, after such a train of facts and circumstances as this record developes, in which they have participated, and to which, by their sanction, they have given validity, to call them into question now.

The distributees have not only received their distributive portion of the estate of *J. T. Mason*, but they have received the whole of the estate of his administratrix, their mother; whose estate consisted, almost entirely, of what she derived from her intestate, dead husband.

But, to place this question in a still stronger point of view, let us inquire what would be the effect of setting aside those proceedings in the Orphans Court? There is no offer on the part of those who have received this estate, to account for it; and in fact the record shows, that some of them have placed a large part of this estate beyond their control, even if they were willing to do so; and, they, who seek equity, must first do equity.

There is less doubt, or difficulty, as to the settlement and distribution of *Mrs. E. Mason's* estate; and we think its legality beyond question. But, if we did doubt the legality of this distribution in this estate, we do not see how this proceeding could affect it.

That the question in relation to the plate, and horses, and carriage, could not be affected by the distribution of the estates of *Mr.* and *Mrs. Mason*, we think too clear to require an argument. These articles not having belonged to either of these intestates estates, at the time of their death, from any thing which appears on the record.

The plate, was a legacy, by the will of *Richard Barnes* to *J. T. Mason*, for his life; after which, it was bequeathed to *A. Barnes*. Vide. 3 *Gill & John.*, 86.

*Mrs. Mason* appears to have acquired the slave, *John Robinson*, after the death of her husband; and he can, by no possibility be subject to the execution in the hands of the sheriff, in this case. As *John Robinson* must necessarily be the property of the grantees, in the deeds from *Abraham*

*Barnes* and others to *Gordon and Schley*, and the deed to *Price* and others ; or, otherwise, the property of the administrator, *de bonis non*, of *Elizabeth Mason*. But, it is the opinion of this court, that the property passed by the deeds, from *Abraham Barnes* and others, to the grantees therein named.

The injunction, issued in the case, must, therefore, be dissolved, as to the said plate, carriage, and horses ; and, as to all the other property levied upon, by said *Keller*, except the negroes or slaves : and must be made perpetual, as to all the negroes or slaves levied upon by him.

DECREE REVERSED IN PART.